ENTER NO JS-6 SEND



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY A. WAXMAN, et al., | ) CASE NO. CV 04-3467 MMM (MANx) |
| Plaintiffs, | ) |
| v. | ) ORDER GRANTING DEFENDANT'S ) MOTION TO DISMISS, AND DENYING ) PLAINTIFFS' MOTION FOR SUMMARY |
| TOMMY G. THOMPSON, Secretary of Health and Human Services, | ) JUDGMENT ) |
| Defendant | ) ) |

18    Plaintiffs are eighteen Members of the United States House of Representatives who serve

19  on the House Committee on Government Reform.[1]  Defendant Tommy G. Thompson is the

20  Secretary of Health and Human Services, who by law is charged with "supervis[ing] and

21  direct[ing]" the Department of Health and Human Services ("HHS") and its constituent agencies,

22  including the Centers for Medicare & Medicaid Services ("CMS").[2]

23    This action involves plaintiffs' claimed right, under 5 U.S.C. §§ 2954 and 7211, as well

24

25    [1]Defendant's Statement Of Uncontroverted Facts And Conclusions Of Law ("Def.'s
26  Facts"), ¶ 1.

27    [2]Def.'s Facts, ¶ 2; 42 U.S.C. § 3501; Reorg. Plan No. 1 of 1953, eff. Apr. 11, 1953, 18
F.R. 2053, 67 Stat. 631.  Since this action was filed, Mike Leavitt has become Secretary of the
28  Department of Health and Human Services.

35

1    as related statutes, to demand access to documents in HHS' possession that detail the anticipated

2    costs of the Medicare Prescription Drug and Modernization Act of 2003. The documents in

3    question were prepared by CMS' Office of the Chief Actuary prior to the Act's passage.[3]

4

5                              **I. FACTUAL BACKGROUND**

6    **A.    Plaintiffs' Document Demand**

7          On December 8, 2003, President Bush signed into law the Medicare Prescription Drug and

8    Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066 (the "Medicare Modernization Act"

9    or "the Act").[4] The proposed fiscal year 2004 budget prepared by the Office of Management and

10   Budget ("OMB") allocated $400 billion over ten years for the cost of the Medicare Modernization

11   Act. The Congressional Budget Office ("CBO") similarly estimated that the 10-year cost of the

12   Act would be $400 billion.[5] Prior to a vote in the United States House of Representatives on the

13   Medicare Modernization Act, the President, Secretary Thompson, and other administration

14   officials publicly stated that the estimated ten-year cost of the legislation would be $400 billion.[6]

15   The proposed fiscal year 2005 budget prepared by OMB, however, estimated that the cost of the

16   Medicare Modernization Act, as passed, would be $534 billion over ten years. This estimate was

17   based on an analysis prepared by the CMS' Office of the Chief Actuary.[7] Although HHS's Chief

18   Actuary did not produce a final estimate of the bill's costs until after its passage, defendant

19   contends it was well known during the legislative debate on the Act that there were substantial

20

21

22   _____

23   [3]Complaint, ¶ 1.

24   [4]Plaintiffs' Statement Of Uncontroverted Facts And Conclusions Of Law ("Pls.' Facts"),
     ¶ 1; Defendant's Statement Of Genuine Issues Of Material Fact ("Def.'s Issues"), ¶ 1.

25
     [5]Pls.' Facts, ¶ 2; Def.'s Issues, ¶ 2.
26
     [6]Pls.' Facts, ¶ 4; Def.'s Issues, ¶ 4.
27
     [7]Pls.' Facts, ¶ 5; Def.'s Issues, ¶ 5.
28
                                          2

1  differences between the CBO and HHS estimates.[8]  Plaintiffs contend, to the contrary, that, prior

2  to a vote on the Medicare Modernization Act in the House of Representatives, they were not

3  informed of the Chief Actuary's analysis of the bill's projected cost.[9]

4       Plaintiffs assert that Thompson and/or his subordinates suppressed dissemination of the

5  Chief Actuary's cost analysis to Members of Congress and to the public.[10]  Defendant concedes

6  that the HHS Office of the Inspector General found that CMS Administrator Thomas A. Scully

7  told Richard S. Foster, the Chief Actuary, that he would take disciplinary action against Foster

8  if Foster provided information concerning the cost of the Act in response to Congressional

9  requests.  The Office of the Inspector General found that one of Scully's staff assistants made

10  similar statements to Foster as well.[11]

11       On February 3, 2004, three senior Members of Congress – plaintiff Henry A. Waxman,

12  Ranking Minority Member, Committee on Government Reform, John D. Dingell, Ranking

13  Minority Member, Committee on Energy and Commerce, and Charles B. Rangel, Ranking

14  Minority Member, Committee on Ways and Means – wrote to Secretary Thompson, asking that

15  he make available to Congress and the public the cost information the Administration had in hand

16  when it sought passage of the Medicare Modernization Act.[12]  The letter stated that each of the

17  signatories was unaware, at the time the House voted on the Act, that the Chief Actuary estimated

---

21  [8]Def.'s Issues, ¶ 5.

22  [9]Pls.' Facts, ¶ 7.  Plaintiffs' assertion that they were not informed of the HHS estimate
23  prior to a vote in the House on the Medicare Modernization Act is supported only by the
    declaration of Sarah Despres, Minority Counsel to the House Governmental Reform Committee.
24  None of the plaintiffs has submitted a declaration stating that he or she did not know of the HHS
    estimate prior to voting on the Act.

25  [10]Pls.' Facts, ¶ 10.
26
27  [11]Def.'s Issues, ¶ 10.

28  [12]Pls.' Facts, ¶ 14; Def.'s Issues, ¶ 14.

3

the ten-year cost at more than $500 billion.[13]  On March 2, 2004, plaintiffs invoked 5 U.S.C. § 2954, and asserted a statutory right to obtain the Chief Actuary's cost analysis. They asked that Secretary Thompson make available any estimates and analyses prepared by the Office of the Chief Actuary on or after January 1, 2003 regarding (1) S.1, the legislation passed by the Senate; (2) H.R. 1, the legislation passed by the House; (3) versions of the final legislation considered by the House-Senate Conference Committee; or (4) the final legislation signed by the President on December 8, 2003.[14]

On March 17, 2004, Representative Waxman wrote Secretary Thompson on plaintiffs' behalf, stating that they had not yet received any response to their request, and that they would initiate legal action under § 2954 to obtain the requested information if it was not produced.[15]  On April 16, 2003, Dennis G. Smith, Director of CMS' Center for Medicaid and State Operations, sent Waxman four documents that had previously been released to the public, and that were subject to disclosure under the Freedom of Information Act ("FOIA").[16]  Asserting that § 2954 did not give plaintiffs a right to the records requested, Smith stated that HHS declined to release any further documents.[17]  On April 26, 2004, plaintiffs wrote Secretary Thompson, noting that his response to their request was "plainly incomplete," and asking that he provide a "complete response" by May 10, 2004.[18]  When no further response was received, they filed this action on May 17, 2004.[19]

---

[13]Declaration of Sarah Depres In Support Of Plaintiffs' Motion For Summary Judgment ("Depres Decl."), Exh. 1 at 1-2.

[14]Pls.' Facts, ¶ 15; Def.'s Issues, ¶ 15; Def.'s Facts, ¶¶ 3-4; Depres Decl., Exh. 2 at 3.

[15]Pls.' Facts, ¶ 16; Def.'s Issues, ¶ 16; Def.'s Facts, ¶ 5.

[16]Pls.' Facts, ¶ 17; Def.'s Issues, ¶ 17; Def.'s Facts, ¶¶ 6-7.

[17]Declaration of Paul E. Soeffing In Support Of Defendant's Motion To Dismiss, Or, In The Alternative, For Summary Judgment ("Soeffing Decl."), Exh. C at 0013.

[18]Pls.' Facts, ¶ 18; Def.'s Issues, ¶ 18; Def.'s Facts, ¶ 9.

[19]Id.

**B.    The Statutory Basis For Plaintiffs' Claims**

Plaintiffs contend they are entitled to judicial enforcement of their right to obtain the requested documents under 5 U.S.C. §§ 2954 and 7211, and related statutes.[20]  5 U.S.C. § 2954 provides:

> "An Executive agency, on request of the Committee on Government Operations of the House of Representatives, or of any seven members thereof, or on request of the Committee on Governmental Affairs of the Senate, or any five members thereof, shall submit any information requested of it relating to any matter within the jurisdiction of the committee."[21]  5 U.S.C. § 2954.

Plaintiffs invoke the so-called "Rule of Seven" provision in support of their request that the court compel enforcement of their request for the cost analysis documents.  Although § 2954 is silent on the issue of judicial enforcement, plaintiffs contend that it may be enforced by writ of mandate or under the Administrative Procedure Act ("APA"), which empowers courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. §§ 551(13), 706(1).

Plaintiffs also assert that defendant's actions violate 5 U.S.C. § 7211, which states:

> "The right of employees, individually or collectively, to petition Congress or a Member of Congress, or to furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied."  5 U.S.C. § 7211.

Plaintiffs' complaint also alleges violations of statutes that are "related" to § 7211.  In their briefs respecting the pending motions, plaintiffs identify Pub. L. 108-199, Division F, "Transportation, Treasury, and Independent Agency Appropriations, 2004," Section 618, 118 Stat. 3, 344 (Jan. 23, 2004) as one of these related statutes.  Section 618 provides, in relevant part:

---

[20]Complaint, ¶ 1.

[21]The House Committee on Government Reform is the current name of a committee that was previously known as the "House Oversight Committee," and later known as the "Committee on Government Operations of the House of Representatives."

5

"No part of any appropriation contained in this or any other Act shall be available for the payment of the salary of any officer or employee of the Federal Government, who –

(1) prohibits or prevents, or attempts or threatens to prohibit or prevent, any other officer or employee of the Federal Government from having any direct oral or written communication or contact with any Member, committee, or subcommittee of the Congress in connection with any matter pertaining to . . . the department or agency of such other officer or employee in any way, irrespective of whether such communication or contact is at the initiative of such other officer or employee or in response to the request or inquiry of such Member, committee, or subcommittee" Pub. L. 108-199, Division F, Section 618, 118 Stat. 3, 354 (Jan. 23, 2004).

## C.    The Instant Motions

On August 20, 2004, defendant filed a motion to dismiss the action under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and an alternative motion for summary judgment under Rule 56. Defendant asserts that plaintiffs lack standing to bring the action under Article III of the United States Constitution; that the statutes on which they purport to base their claims do not provide a right of action; and that the court should decline to assert jurisdiction over the action under the doctrine of equitable discretion. As respects the merits of the claims stated in the complaint, defendant argues that 5 U.S.C. § 2954 does not provide a right of access to the information plaintiffs sought from HHS, that the denial of access to the information is not actionable under the APA or in a mandamus proceeding, and that plaintiffs have no enforceable rights under 5 U.S.C. § 7211 or section 618 of Public Law 108-199.

On September 17, 2004, plaintiffs filed a cross-motion for summary judgment. They contend that they have standing to bring the action, that 5 U.S.C. § 2954 mandates that defendant comply with their document request, and that they are entitled to immediate relief under the APA. Plaintiff also argue that their claims are cognizable in a mandamus action if no other adequate remedy is available, and that they are entitled to pursue enforcement of the document request

6

1  under 5 U.S.C. § 7211 and section 618.

2

3                                   **II. DISCUSSION**

4    **A.    Standard Governing Motions For Summary Judgment**

5          A motion for summary judgment must be granted when "the pleadings, depositions,

6    answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

7    there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

8    as a matter of law." FED.R.CIV.PROC. 56(c).  A party seeking summary judgment bears the

9    initial burden of informing the court of the basis for its motion and of identifying those portions

10   of the pleadings and discovery responses that demonstrate the absence of a genuine issue of

11   material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party

12   will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that

13   no reasonable trier of fact could find other than for the moving party.  On an issue as to which

14   the nonmoving party will have the burden of proof, however, the movant can prevail merely by

15   pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.*

16   If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or

17   as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."

18   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e).

19          In judging evidence at the summary judgment stage, the court does not make credibility

20   determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most

21   favorable to the nonmoving party.  See *T.W. Electric Service, Inc. v. Pacific Electric Contractors*

22   *Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  The evidence presented by the parties must be

23   admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving

24   papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See *Falls*

25   *Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc.*

26   *v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

27   **B.    General Standing Principles**

28          Defendant first asserts that plaintiffs lack standing to bring the action.  Standing is "an

7

1   essential and unchanging part of the case-or-controversy requirement of Article III," and thus

2   constitutes a limitation on the court's jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

3   560 (1992); see also *Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("One element of the case-or-

4   controversy requirement is that appellees . . . must establish that they have standing to sue,"

5   citing *Lujan*, 504 U.S. at 561)). Article III standing rests on the idea of separation of powers.

6   Courts must thus analyze a party's standing to sue by "reference to the Art[icle] III notion that

7   federal courts may exercise power only in the last resort, and as a necessity, and only when

8   adjudication is consistent with a system of separated powers and [the dispute is one] traditionally

9   thought to be capable of resolution through the judicial process." *Allen v. Wright*, 468 U.S. 737,

10  752 (1984) (internal citations and quotation marks omitted); see also *Raines*, 521 U.S. at 820

11  (noting that principles of standing reflect an "overriding and time-honored concern about keeping

12  the Judiciary's power within its proper constitutional sphere").

13      To establish standing, a plaintiff must show (1) that he or she has suffered an "injury in

14  fact"; (2) that there is a causal connection between the injury and the conduct that is alleged in

15  the complaint; and (3) that it is "likely," as opposed merely to "speculative," that the injury will

16  be "redressed by a favorable decision." See *Lujan*, 504 U.S. at 560-61. The party invoking

17  federal jurisdiction bears the burden of establishing each of these elements. See *id.* at 559.

18      Defendant asserts that plaintiffs cannot establish they have suffered an "injury in fact."

19  To show "injury in fact," a plaintiff must demonstrate that there has been "an invasion of a

20  legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent,

21  not "conjectural" or "hypothetical."'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*,

22  495 U.S. 149, 155 (1990)). The purpose of the requirement is to "assure that concrete

23  adverseness which sharpens the presentation of issues upon which the court so largely depends

24  for illumination of difficult . . . questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962).

25      The Supreme Court has held that the "actual or threatened injury required by Art[icle] III

26  may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates

27  standing.'" *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citing *Linda R. S. v. Richard D.*, 410

28  U.S. 614, 617 n. 3 (1973)); *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972). Where private

1   plaintiffs assert the violation of a statute that confers a right to obtain information on "any

2   person," the Supreme Court has held that deprivation of the right to access constitutes an injury-

3   in-fact.  See *Federal Election Commission v. Akins*, 524 U.S. 11, 21 (1998) (holding that voters

4   had adequately alleged an "injury in fact" where they asserted that defendants had violated the

5   disclosure provisions of the Federal Election Campaign Act (the "FECA"), and deprived them

6   of a statutory right to obtain lists of donations to, and campaign-related contributions and

7   expenditures by, the American Israel Public Affairs Committee (AIPAC), because "[t]here is no

8   reason to doubt their claim that the information would help them (and others to whom they would

9   communicate it) to evaluate candidates for public office, especially candidates who received

10  assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in

11  a specific election.  Respondents' injury consequently seems concrete and particular"); *Public

12  Citizen v. Department of Justice*, 491 U.S. 440, 449-50 (1989) (holding that plaintiffs had

13  standing where they brought suit "to compel the Justice Department and the ABA Committee to

14  comply with [the Federal Advisory Committee Act]'s charter and notice requirements, and

15  [sought] access to the ABA Committee's meetings and records in order to monitor its workings

16  and participate more effectively in the judicial selection process.  Appellant [Washington Legal

17  Foundation ("WLF")] has specifically requested, and been refused, the names of candidates under

18  consideration by the ABA Committee, reports and minutes of the Committee's meetings, and

19  advance notice of future meetings. . . . As when an agency denies requests for information under

20  the Freedom of Information Act, refusal to permit appellants to scrutinize the ABA Committee's

21  activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing

22  to sue" (citation omitted)); *Havens Realty v. Coleman*, 455 U.S. 363, 373-74 (1982) (holding

23  that, where "Congress has . . . conferred on all 'persons' a legal right to truthful information

24  about available housing," deprivation of such information constitutes an injury in fact).

25        C.    **Whether Plaintiffs Have Standing To Assert Their Claims**

26              1.    **5 U.S.C. § 2954**

27        Plaintiffs assert that, under *Akins*, *Public Citizen*, and *Havens Realty*, they have sufficiently

28  alleged an injury-in-fact.  Defendant contends these cases are distinguishable because they concern

9

1   statutes that confer a legal right to obtain information on individuals. He asserts that 5 U.S.C.

2   § 2954, the statute under which plaintiffs sue, does not create any rights of a "personal nature"

3   but merely confers authority on Members of Congress to request information in their official

4   capacity as members of the Committee on Government Reform.[22]

5        In support, defendant cites the Supreme Court's decision in *Raines v. Byrd*, 521 U.S. 811

6   (1997). There, individual Members of Congress challenged the constitutionality of the Line Item

7   Veto Act. Noting that the legislators bore the burden of showing that their injury was "personal,

8   particularized, concrete and otherwise judicially cognizable" (*id.* at 820), the Court observed that

9   plaintiffs argued the Act "cause[d] a type of institutional injury (the diminution of legislative

10  power), which necessarily damage[d] all Members of Congress and both Houses of Congress

11  equally." *Id.* at 820. It characterized the legislators' "claim of standing [as] based on [the] loss

12  of political power [that flowed from the President's power to veto particular items within an

13  appropriations bill], not loss of any private right, which would make the injury more concrete,"

14  and concluded that they asserted injury "not . . . in any private capacity but solely because they

15  [were] Members of Congress." *Id.* at 821. As a consequence, it held that the legislators did "not

16  have a sufficient 'personal stake' in th[e] dispute and ha[d] not alleged a sufficiently concrete

17  injury to . . . establish[ ] Article III standing." *Id.* at 830.

18        In reaching this result, the *Raines* Court distinguished *Powell v. McCormack*, 395 U.S. 486

19  (1969). There, a Member of Congress who challenged his exclusion from the House of

20  Representatives and his consequent loss of salary was found to have standing to sue. *Raines*, 521

21  U.S. at 820-21 (citing *Powell*, 395 U.S. at 496, 512-14). The *Raines* Court noted that, unlike

22  Congressman Powell, the legislators challenging the Line Item Veto Act (1) had "not been singled

23  out for specially unfavorable treatment as opposed to other Members of their respective bodies";

24  (2) did "not claim that they ha[d] been deprived of something to which they *personally* [were]

25  entitled – such as their seats as Members of Congress after their constituents had elected *them*";

26  _____

27  [22]Reply Memorandum In Support Of Defendant's Motion To Dismiss, Or, In The Alternative, For Summary Judgment, And Memorandum Of Points And Authorities In

28  [Opposition] To Plaintiffs' Motion For Summary Judgment, ("Def.'s Reply") at 3 - 4.

1    and (3) did not claim injury to a right that belonged directly to them but rather to one that ran with

2    their Congressional seats. *Raines*, 521 U.S. at 821 (emphasis original). As respects this last

3    distinction, the Court stated: "If one of the Members were to retire tomorrow, he would no longer

4    have a claim; the claim would be possessed by his successor in instead. The claimed injury thus

5    runs (in a sense) with the Member's seat, a seat which the Member holds (it may be quite

6    arguably said) as trustee for his constituents, not as a prerogative of personal power." *Id.*

7         The *Raines* Court also distinguished *Coleman v. Miller*, 307 U.S. 433 (1939), a case which

8    held that members of the Kansas legislature had standing to challenge the power of the state's

9    Lieutenant Governor to cast a deciding vote in favor of a proposed child labor amendment. The

10    Lieutenant Governor's vote broke a twenty-twenty deadlock that would otherwise have prevented

11    ratification of the amendment. *Id.* at 436-37. The *Raines* Court stated that *Coleman* stood, at

12    most, "for the proposition that legislators whose votes would have been sufficient to defeat (or

13    enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or

14    does not go into effect), on the ground that their votes have been completely nullified." *Raines*,

15    521 U.S. at 823. It contrasted this with the claim of the legislators challenging the Line Item

16    Veto Act, who did not assert nullification of their votes on appropriations bills, but only that those

17    votes were less effective because the President had the ability to "cancel" individual

18    appropriations. See *id.* at 825-26 ("There is a vast difference between the level of vote

19    nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is

20    alleged here. To uphold standing here would require a drastic extension of *Coleman*. We are

21    unwilling to take that step").[23]

22

---

23    [23]The *Raines* Court also "attach[ed] some importance to the fact that appellees [had] not
been authorized to represent their respective Houses of Congress in [the] action." Additionally,
24    it noted that dismissal of the suit "neither deprive[d] Members of Congress of an adequate remedy
(since they [could] repeal the Act or exempt appropriations bills from its reach), nor foreclose[d]
25    the Act from constitutional challenge (by someone who suffers judicially cognizable injury as a
result of the Act)." *Id.* at 829. It declined to decide "[w]hether the case would be different if any
26    of these circumstances were different." *Id.* at 829-30. The question reserved in *Raines* does not
arise here. First, the House of Representatives has not authorized plaintiffs to file this action, and
27    the suit is opposed by the House majority leadership. Both the Ways and Means Committee and
28

1    One court has described *Raines* as drawing

2    "a fundamental distinction between suits in which a member of Congress argues

3    that he or she has been deprived of something to which he or she is personally

4    entitled and suits in which the member alleges an institutional injury, such as the

5    diminution of legislative power. . . . In the former case, the member of Congress

6    has standing to sue. In the latter case, the member of Congress lacks standing,

7    unless the injury alleged is severe enough to meet *Coleman*'s strict 'complete

8    nullification' standard." *Kuchinich v. Defense Finance & Accounting Service*, 183

9    F.Supp.2d 1005, 1009 (N.D. Ohio 2002) (citing *Raines*, 521 U.S. at 820-21).

10    The *Raines* majority described the differing types of injury as "loss of political power,"

11    and "loss of a[ ] private right." *Id.* at 821. The concurring and dissenting Justices in *Raines*

12    discussed the distinction in terms of injuries that are "personal" and "official." *Id.* at 830-31 &

13    n. 2 (Souter, J., concurring in the judgment) (recognizing the distinction between "personal" and

14    "official" injuries, and noting that "it is also possible that the impairment of certain official

15    powers may support standing for Congress, or one House thereof, to seek the aid of the Federal

16    Judiciary"); *id.* at 841 (Breyer, J., dissenting) (disagreeing with the majority's distinction

17

18    the Committee on Energy and Commerce, moreover, have declined to adopt resolutions

19    requesting that the documents that are the subject of the suit be released to the House. Second, it appears that plaintiffs have an alternate remedy available if they can persuade a majority of their

20    House colleagues to use Congress' subpoena power to obtain the documents sought.

21    Finally, it appears that the House may have standing to challenge defendant's decision to refrain from producing the documents. See *Raines*, 521 U.S. at 831 n. 2 (Souter, J., concurring

22    in the judgment) (". . . it is possible that the impairment of certain official powers may support standing for Congress, or one House thereof, to seek the aid of the Federal Judiciary"); *McGrain*

23    *v. Daugherty*, 273 U.S. 135, 174 (1927) ("We are of opinion that the power of inquiry – with process to enforce it – is an essential and appropriate auxiliary to the legislative function"); *United*

24    *States v. American Telephone & Telegraph*, 551 F.2d 384, 391 (D.C. Cir. 1976) ("it is clear that the House as a whole has standing to assert its investigatory power. . ."); *United States House of*

25    *Representatives v. United States Department of Commerce*, 11 F.Supp.2d 76, 85-86 (D.D.C.

26    1998) (holding that an "informational injury" suffered by the House, *inter alia*, gave it standing because "a legislative body suffers an injury . . . when it cannot obtain information necessary to

27    perform its constitutional apportionment function," and stating that the rule was the same with

28    respect to its "legislative or judicial functions").

1    "between disputes involving a 'personal' harm and those involving an 'official' harm").

2         Plaintiffs contend that their injury satisfies the *Coleman* standard of complete nullification.

3    They note that, assuming they are right on the merits (as the court must for purposes of assessing

4    standing), their request for documents was sufficient to require production of the records sought,

5    and compare this to *Coleman*, where the legislators' votes "would have been sufficient" to defeat

6    the amendment.[24]  Plaintiffs read *Coleman* too broadly.  The *Raines* Court narrowly construed

7    *Coleman* to apply *only to the nullification of legislators' votes*. *Raines*, 521 U.S. at 824 & n. 8;[25]

8    see generally *Campbell v. Clinton*, 203 F.3d 19, 20-22 (D.C. Cir. 2000) (recognizing that

9    *Coleman* represents a very narrow exception to the general rule that legislators lack standing to

10   challenge the lawfulness of executive action, and concluding that Members of Congress had no

11   standing to pursue claims that the President violated the War Powers Resolution and exceeded his

12   constitutional authority by waging war without a congressional delegation); *Chenoweth v. Clinton*,

13   181 F.3d 112, 113, 116-17 (D.C. Cir. 1999) (holding, under *Raines*, that members of the House

14   of Representatives had no standing to challenge the implementation of the American Heritage

15   Rivers Initiative ("AHRI"), although they asserted that the President's enactment of the initiative

16   by executive order was unconstitutional because the claim that "the President denied them their

17   proper role in the legislative process and, consequently, diminished their power as Members of

18   the Congress" did not fall within "the narrow rule announced in *Coleman v. Miller*" requiring

19   complete nullification of their votes).  Because plaintiffs do not claim that defendant's failure to

20   produce the requested documents nullified their *votes*, and assert only that they have been required

21   to vote and legislate without full access to information, *Coleman* provides no basis for a finding

22   that plaintiffs have standing to sue.

23

24        [24]Plaintiffs' Memorandum of Points and Authorities ("Pls.' Mem.") at 18-19 (quoting

25   *Raines*, 521 U.S. at 823).

26        [25]The Court also recognized, without deciding, that *Coleman*, which involved state

27   legislators, might have "no applicability to a similar suit brought by federal legislators, since the
     separation-of-powers concerns present in such a suit were not present in *Coleman*." *Id.* at 824

28   n. 8.

1      Given that plaintiffs' claim does not fall within *Coleman*'s narrow rule conferring standing

2  on legislators to sue for injuries suffered in their official capacities, plaintiffs' right to maintain

3  the action depends on a showing that they have suffered a personal, concrete and particularized

4  injury. The injury plaintiffs assert is not directly analogous to that which was claimed in *Raines*,

5  i.e., the impairment of legislative power, nor to that considered in *Powell*, i.e., the deprivation

6  of a seat in Congress and attendant salary. As in *Raines*, however, the right plaintiffs assert flows

7  directly from the fact that they hold seats in Congress.[26] Defendant correctly notes, in this regard,

8  that "[i]f plaintiffs retired from Congress tomorrow, or even resigned from the Committee on

9  Government Reform, they would no longer be entitled to request information under Section

10  2954."[27]

11      Citing *Coleman* and *Powell*, plaintiffs assert that their right to request information under

12  § 2954 is personal because they have a "distinct legal entitlement," not shared by all Members

13  of Congress, to request information from the executive branch. They compare this entitlement

14  to request information to Congressman Powell's entitlement to take his seat, and note that the

15  Supreme Court held Powell had standing despite the fact that his entitlement was "dependent on

16  his congressional status."[28] Consequently, plaintiffs contend, the injury they suffered when

17  defendant failed to provide the documents they requested is sufficient to confer standing.[29]

18      Given the allegations in their complaint, plaintiffs cannot entirely distinguish *Raines*.

19  Plaintiffs allege that defendant's failure to provide information impaired "their ability to assess

20

21

22  [26]The right does not, strictly speaking, "run" with the seat, since a successor to one of the
named plaintiffs might not be named to the Committee on Government Reform, or if designated

23  a member of that committee, might not join in a request for information. Such a member would
not have standing to challenge the denial of his or her predecessor's records request.

24

25  [27]Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss,
or, in the Alternative, for Summary Judgment ("Def.'s Mem.") at 17.

26  [28]Pls.' Mem. at 18.

27

28  [29]*Id.* at 16 (arguing that § 2954 creates a "statutory right that runs directly to the
plaintiffs").

whether legislation [was] needed" or whether a bill that had passed should be "revisit[ed]."[30]
They thus effectively concede that their request was in aid of the performance of their legislative
duties rather than for any private purpose. It is true, as plaintiffs contend, that the right to request
and receive information "runs to members of a single committee in each House of Congress who
join, along with the requisite number of other committee members, to request specific documents
from an executive agency."[31] In this sense, the right is different, and presents a closer case, than
the more "abstract loss of political power through dilution of the legislative process" that was at
issue in *Raines*. In *Raines*, exercise of the President's line item veto diluted the votes of all
legislators who supported an appropriations bill to the same extent by, because it altered the
legislation passed by Congress. Here, only those Members who made a request under § 2954
have had that request denied.[32] The question is whether this difference supports a conclusion that
the injury allegedly suffered by plaintiffs is akin to that suffered by Congressman Powell, and is
"personal" in the sense in which *Raines* used that term.[33]

---

[30]*Id.* at 17 (quoting Complaint, ¶ 31 ("As a result of defendant Thompson's failure to
provide the information in a timely fashion, and defendant Thompson's continued interference
with the right of the Chief Actuary and his staff to provide the information to Members of
Congress, plaintiffs are harmed in many ways, including, but not limited to, their ability to assess
whether legislation is needed to prevent defendant Thompson and his successors from concealing
relevant actuarial information about the cost of Medicare and Medicate programs from Congress
in the future; whether, in light of the dramatic discrepancies in cost, Congress should revisit the
Medicare Prescription Drug and Modernization Act of 2003; and whether more substantial
protections should be put in place to ensure that defendant Thompson and his subordinates, and
other senior government officials, do not continue to interfere with the right of government
employees to report relevant information to Congress")).

[31]*Id.* at 17.

[32]*Id.* at 17-18 (noting that the injury the requesting committee members assert is "not
shared by Congress as a whole . . . [nor] even !!'! by members of the committee who do not join
in the request").

[33]Plaintiffs suggest that a denial of standing in this case would be tantamount to a finding
"that legislators have less standing to sue than [the private citizen plaintiffs in *Akins*, *Public
Citizen*, and *Havens Realty*]." They contend that dismissal of the suit would prevent Members
of Congress from using FOIA to obtain agency records or invoking FACA to obtain advisory

1    Although the Supreme Court has held that private individuals sustain an injury-in-fact when

2   they are denied a statutory right to information (see *FEC*, 524 U.S. at 500; *Public Citizen*, 491

3   U.S. at 449-50; *Havens Realty*, 455 U.S. at 373-74), no federal court appears to have addressed

4   whether legislators who have a statutory right to information because they are members of a

5   particular legislative committee have standing to sue when their request is refused.[34]  The most

6   closely analogous case is *Walker v. Cheney*, 230 F.Supp.2d 51 (D.D.C. 2002).  There, a court

7   held that the Comptroller General of the United States lacked standing to sue to enforce a request

8   presented to Vice President Cheney for information regarding the National Energy Policy

9   Development Group ("NEPDG").  *Id.* at 52-53.  The Comptroller General had commenced an

10  investigation, in his role as head of the General Accounting Office and a Congressional agent,

11  regarding the NEPDG's composition and activities.[35]  *Id.* at 53.  Pursuant to his broad authority

12

13  committee records. (Pls.' Mem at 19-20, n. 14).  Defendant does not assert that legislators have

14  "less standing to sue" than others when they make records requests in their capacity as private
    citizens, and do not assert rights that derive from their institutional role.  Rather, he urges that

15  any suit based on injury to an institutional interest must be analyzed under *Raines*.

16      [34]In *Waxman v. Evans*, CV 01-4530 LGB (AJWx), 2002 WL 32377615 (C.D. Cal. Jan.

17  18, 2002), Judge Lourdes Baird granted summary judgment in favor of plaintiffs in an action
    brought by sixteen members of the House Committee on Government Reform against the

18  Secretary of the Department of Commerce to compel disclosure of census data under 5 U.S.C.
    § 2954.  *Id.* at *1.  The court's order did not address the legislators' standing to sue.  Following

19  entry of Judge Baird's order, the Secretary filed a motion for reconsideration, asserting, *inter*

20  *alia*, that plaintiffs lacked standing.  See *Waxman v. Evans*, CV 01-4530 LGB (AJWx), Civil
    Minutes-General at 2 (C.D. Cal. March 21, 2002).  The court found that defendant's standing

21  argument could have been raised when the original motion was briefed, and declined to consider

22  the issue under Local Rule 7-18 and Rule 60(b) of the Federal Rules of Civil Procedure.  *Id.* at
    * 3 (noting that "though the Plaintiffs specifically discussed the standing issue in their opening

23  brief, . . . the Secretary declined to address it" (citation omitted)).  On the Secretary's appeal of

24  Judge Baird's order, the Ninth Circuit likewise did not address standing, as it determined that its
    decision in *Carter v. United States Department of Commerce*, 307 F.3d 1084 (9th Cir. 2002),

25  which mandated disclosure of the census data under FOIA, rendered the case moot.  See *Waxman*

26  *v. Evans*, 52 Fed. Appx. 84, 2002 WL 31748590, * 1 (9th Cir. Dec. 6, 2002) (Unpub. Disp.).

27      [35]As the court explained, "Congress created the GAO in 1921 in the belief that it needed
    an officer, responsible to it alone, to check upon the application of public funds in accordance

28  with appropriations."  *Walker*, 230 F.Supp.2d at 53 (internal quotations and citation omitted).

1  to carry out investigations for the benefit of Congress under 31 U.S.C. §§ 712, 716, and 717, the

2  Comptroller General sought to obtain NEPDG records. *Id.* at 53-54. These statutes provide,

3  *inter alia*, that the Comptroller General shall "investigate all matters related to the receipt,

4  disbursement, and use of public money" (31 U.S.C. § 712(1)), and that, under appropriate

5  circumstances, the Comptroller General may enforce his investigatory powers by bringing a

6  lawsuit to compel the production of records (see 31 U.S.C. § 716(b)(2)).

7      When the records the Comptroller General requested were not forthcoming, he sued Vice

8  President Cheney, NEPDG's Chair. His complaint asserted that he sought the records "'to

9  determine how the NEPDG's energy policy recommendations were developed, in order to aid

10  Congress in considering proposed legislation, assessing the need for and merits of further

11  legislative changes, and conducting oversight of the executive branch's administration of existing

12  laws.'" *Id.* at 58.

13      Noting that an "especially rigorous" standing inquiry was required because the dispute

14  involved "a . . . confrontation between the political branches,"[36] the *Walker* court found that the

15  Comptroller General had "failed to meet his 'burden of establishing that [his] claimed injury [was]

16  personal, particularized, concrete, and otherwise judicially cognizable.'" *Walker*, 230 F.Supp.2d

17  at 65-66, 69 (quoting *Raines*, 521 U.S. at 820). Rather, the court held, he had "no personal

18  stake" in the matter, as his interest was "solely institutional [and] relat[ed] exclusively to his

19

20      [36]Although the *Walker* court described the confrontation as a "constitutional" one (see *id.*

21  at 69 (citing *Allen*, 468 U.S. at 819, and *Schlesinger*, 418 U.S. at 221), neither the Comptroller
   General nor plaintiffs here claim that the failure to provide information in response to their

22  requests violates a constitutional right. Compare *Raines*, 521 U.S. at 819-20 ("our standing

23  inquiry has been especially rigorous when reaching the merits of the dispute would force us to
   decide whether an action taken by one of the other two branches of the Federal Government was

24  unconstitutional"). The *Walker* court's reference to the constitutional dimensions of the suit was

25  undoubtedly prompted by the fact that the dispute was between representatives of the executive
   and legislative branches, and thus implicated the separation of powers doctrine. Cf. *Waxman v.*

26  *Evans*, 2002 WL 32377615 at *4 (rejecting the notion that legislators' suit under § 2954 involved

27  "nerve-center constitutional questions" because the executive branch had not invoked executive
   privilege as a basis for declining to release Census 2000 data to the legislators in response to their

28  § 2954 request).

1    duties in his official capacity as Comptroller General of the United States." *Walker*, 230

2    F.Supp.2d at 66. Moreover, the court observed, if the Comptroller General "'were to retire

3    tomorrow,' he would no longer have a claim." *Id.*

4            The court found the institutional injury alleged by the Comptroller General insufficient to

5    support standing as well. It noted that he asserted he was an "agent" of Congress in requesting

6    the information, and that his statutory right to receive information was designed "to aid Congress"

7    in performing its legislative functions. *Id.* Because "the investigatory prerogatives that ha[d]

8    allegedly been frustrated (and the enforcement power [the Comptroller General sought] to employ)

9    obtain[ed] to him only because they ha[d] been delegated by Congress," the court concluded that

10   he had no "freestanding institutional injury or personal injury of his own to assert." *Id.*

11           In reaching this decision, the *Walker* court referenced "some authority in [the District of

12   Columbia] Circuit indicating that a House of Congress or a Committee of Congress would have

13   standing to sue to retrieve information to which it was entitled." See *id.* at 68 (citing *Senate

14   Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974)

15   (en banc), and *United States House of Representatives v. United States Department of Commerce*,

16   11 F.Supp.2d 76 (D.D.C. 1998)). It noted, however, that neither Congress nor a congressional

17   committee had undertaken to compel production of the records, and that no Congressional

18   subpoena for the documents had issued. *Id.* Thus, the court concluded, injury to "any

19   congressional right to information remain[ed] wholly 'conjectural' or 'hypothetical.'" *Id.*[37]

20           Plaintiffs argue that *Walker* was wrongly decided,[38] and that, in any event, their suit is

21   _____

22   [37]The *Walker* court also examined historical practice, which confirmed its view that the
     Comptroller General's statutory right to request information from the executive branch was not
23   sufficient to confer standing. Although it incorrectly stated that "no court has ever ordered the
     Executive Branch to produce a document to Congress or its agents" (*Walker*, 230 F.Supp.2d at
24   70), as Judge Baird had ordered the Secretary of the Department of Commerce to disclose census
25   data in *Waxman v. Evans*, the court in *Walker* accurately observed that disputes respecting inter-
     branch disclosure of information have traditionally been settled without resort to or the
26   involvement of the judiciary. *Walker*, 230 F.Supp.2d at 70-71.

27   [38]Plaintiffs contend that the *Walker* court erred in applying *Raines*' standing analysis to a
28   suit that involved Congress' power to investigate rather than its power to legislate. (Reporter's

1    more akin to a suit by a committee or subcommittee of Congress than to a suit by the Comptroller

2    General. Specifically, they assert that, unlike the Comptroller General, they are not "merely

3    agent[s] of Congress,"[39] but members of a congressional committee who have banded together to

4    request information from the executive branch.

5         Like the Comptroller General, however, plaintiffs seek records to assist Congress in

6    performing its legislative duties. Indeed, they acknowledge that "they sue to enforce a statutory

7    right *on Congress' behalf*."[40] Plaintiffs' concession that they sue on Congress' behalf is consistent

8    with § 2954's legislative history, which reveals that the statute was passed to ensure that both

9    houses of Congress would be able to obtain executive agency information they deemed necessary

10   to carry out their legislative duties. See H.R. Rep. No. 1757, 70th Cong., 1st Sess. 6 (1928)

11

12

---

13   Transcript, January 10, 2005 ("RT") at 7:10-8:4.) While *Raines* involved a claim of injury to
     Congress' legislative power, Congress' investigative power, at issue here and in *Walker*, is

14   derived from and coextensive with Congress' legislative power. See *McGrain*, 273 U.S. at
     173-74 (recognizing first that "the two houses of Congress, in their separate relations, possess not

15   only such powers as are expressly granted to them by the Constitution, but such auxiliary powers
     as are necessary and appropriate to make the express powers effective; and, [second], that neither

16   house is invested with 'general' power to inquire into private affairs and compel disclosures, but
     only with such limited power of inquiry as is shown to exist when the rule of constitutional

17   interpretation just stated is rightly applied. . . . We are of opinion that the power of inquiry –
     with process to enforce it – is an essential and appropriate auxiliary to the legislative function");

18   *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504 n. 15 (1975) ("Although the
     power to investigate is necessarily broad it is not unlimited. . . . The subject of any inquiry

19   always must be one 'on which legislation could be had,'" quoting *McGrain*, 273 U.S. at 177));
     *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) (recognizing that Congress "may only

20   investigate into those areas in which it may potentially legislate or appropriate"); *Quinn v. United
     States*, 349 U.S. 155, 161 (1955) ("There can be no doubt as to the power of Congress, by itself

21   or through its committees, to investigate matters and conditions relating to contemplated
     legislation. This power, deeply rooted in American and English institutions, is indeed

22   co-extensive with the power to legislate. . . . It cannot be used to inquire into private affairs
     unrelated to a valid legislative purpose. Nor does it extend to an area in which Congress is

23   forbidden to legislate"). Consequently, plaintiffs' attempt to undermine *Walker* on the basis that
     it incorrectly applied *Raines* to a case involving 'Congress' investigative power fails.

24

25

26

27   [39]Pls.' Mem. at 18, n. 12 (citing *Walker*, 230 F.Supp.2d at 63).

28   [40]*Id.* at 18 (emphasis added).

19

1  ("To save any question as to *the right of the House of Representatives* to have furnished any of

2  the information contained in the reports proposed to be abolished, a provision has been added to

3  the bill requiring such information to be furnished to the Committee on Expenditures in the

4  Executive Departments or upon the request of any seven members thereof" (emphasis added));

5  S. Rep. No. 1320, 70th Cong., 1st Sess. 4 (1928) ("This section makes it possible to require any

6  report discontinued by the language of this bill to be resubmitted *to either House* upon its

7  necessity becoming evident to the membership of either body" (emphasis added)).

8          As noted earlier, moreover, it is clear that plaintiffs' right to request and receive

9  information from the executive branch pursuant to § 2954 would cease once they were no longer

10  in Congress or no longer a member of the House Committee on Government Reform.  In a very

11  real sense, therefore, the right they assert runs with their congressional and committee seats, and

12  is not personal to them.  See *Raines*, 521 U.S. at 821.

13          Plaintiffs' suit cannot be compared to a subpoena enforcement suit brought by a committee

14  or subcommittee of the House.  The House, or the Speaker when the House is not in session, must

15  authorize such suits.  When a congressional committee sues to enforce a subpoena, it does so only

16  after a resolution of the full House citing the witness for contempt.  This is necessary, the District

17  of Columbia Circuit has observed, to prevent "a wayward committee [from] acting contrary to

18  the will of the House," and to protect the witness from "aberrant subcommittee or committee

19  demands."  *AT&T*, 551 F.2d at 393 & n. 16 (noting that, as respects the subpoena at issue in that

20  case, the House had authorized the subcommittee chair to intervene in the action "on behalf of

21  the interest of the House"); see also *Senate Select Committee on Presidential Campaign Activities*,

22  498 F.2d at 727 (noting that the Senate had passed a resolution authorizing the committee to

23  subpoena and sue the President; *United States House of Representatives*, 11 F.Supp.2d at 82, 86

24  (noting that the House itself filed suit "as a person directly affected and aggrieved by the [Census]

25  Bureau's decision to use statistical sampling in the 2000 census," and concluding that the House

26  had standing because the "informational injury" it had suffered "affect[ed] [it] 'in a personal and

27  individual way'").

28          Here, the House has not authorized plaintiffs to sue to obtain records from defendant under

20

§ 2954.  To the contrary, the two House committees that have considered the matter have

specifically declined to request that the documents be produced.[41]  Plaintiffs, moreover, cannot

assert that § 2954 constitutes a congressional delegation to them of the authority to seek judicial

enforcement of records requests[42] because, as defendant correctly notes, § 2954 does not address

how a records request should be enforced if the official to whom it is directed fails to produce the

---

[41]http://waysandmeans.house.gov/legis.asp?formmode=read&id=1941;
http://energycommerce.house.gov/108/Markups/09302004markup1392.htm.

[42]Plaintiffs suggest that in enacting § 2954, Congress implicitly delegated to members of
the House Committee on Government Reform the power to sue to enforce demands that the
executive branch produce specified records.  They assert that, in 1928, when the statute was
enacted, it was not Congress' practice to include explicit language authorizing judicial
enforcement of its enactments.  (RT at 5:24-7:1; 17:9-21.)  This argument is undercut by the
Supreme Court's decision in *Reed v. County Comm'rs of Delaware County, Pa.*, 277 U.S. 376
(1928), which issued the day before § 2954 was enacted.  In *Reed*, the Court held that Senate
resolutions empowering a Senate special committee, *inter alia*, "to require by subpoena or
otherwise the attendance of witnesses, the production of books, papers, and documents, and to
do such other acts as may be necessary in the matter of said investigation," did not empower the
committee to seek judicial enforcement when its demands for production were refused.  *Id.* at
389.  The Court held that the power to sue was "not specifically granted by either resolution
[under which the special committee was organized]," and rejected the notion that the power to sue
was implicit in the grant of authority "to do such other acts as may be necessary in the matter of
said investigation."  *Id.* at 388-89.  Citing the established practice of "the Senate – and the House
as well – to rely on its own power to compel attendance of witnesses and production of evidence
in investigations made by it or through its committees," the Court concluded that, absent language
signaling a departure from this established practice, "the Senate did not intend to authorize the
committee, or anticipate that there might be need, to invoke the power of the Judicial
Department."  *Id.*

    Like the Senate resolutions at issue in *Reed*, the language and legislative history of § 2954
do not reflect that Congress either anticipated or intended that members would seek to enforce its
provisions judicially.  While *Reed* interpreted Senate resolutions rather than a statute, it put
Congress on notice that it was necessary to make authorization to sue to enforce investigatory
demands explicit if it wished to ensure that such power existed.  *Edelman v. Lynchburg College*,
535 U.S. 106, 117 n. 13 (2002) ("It is not only appropriate but also realistic to presume that
Congress was thoroughly familiar with [Supreme Court] precedents . . . and that it expects its
enactments to be interpreted in conformity with them," quoting *North Star Steel Co. v. Thomas*,
515 U.S. 29, 34 (1995)).  Nonetheless, Congress was silent as to judicial enforcement of § 2954.
Given this silence, the court concludes, as did the Court in *Reed*, that Congress did not expect or
intend that members of the House Committee on Governmental Reform would invoke the power
of the judicial branch to enforce their records demands.

1   documents sought.[43]

2       Accordingly, the court concludes that when defendant declined to produce documents in

3   response to plaintiffs' § 2954 request, plaintiffs did not suffer a personal injury as that term is

4   defined in *Raines*. Rather, Congress, on whose behalf they acted, suffered institutional injury,

5   in that its ability to assess the merits of the Medicare Modernization Act, and determine whether

6   to modify that legislation, was impeded or impaired. This is precisely the type of injury that,

7   under *Raines*, deprives individual legislators of standing to sue. *Raines*, 521 U.S. at 829.[44]

8          **2.    5 U.S.C. § 7211 And Section 618 Of The Consolidated Appropriations**

9                 **Act**

10      Defendant also contends that plaintiffs lack standing under *Raines* to pursue claims under

11  § 7211 and Section 618 of the Consolidated Appropriations Act. Plaintiffs counter that, under

12  these statutes, they are legally entitled to receive any information the Chief Actuary wishes to

13  provide, and thus that they suffered a concrete, personal injury when he was threatened with

---

15      [43]In this respect, § 2954 provides less authorization than 31 U.S.C. § 716(b)(2) under
16  which the Comptroller General sued in *Walker*. Before filing suit, the Comptroller General was
    required to file a report, *inter alia*, with the Congress. See 31 U.S.C. § 716(b)(1), (b)(2)(A);
17  *Walker*, 230 F.Supp.2d at 54. It is also distinct from FOIA, which expressly authorizes an
    individual whose records request has been denied to bring suit in federal court. See 5 U.S.C.
18  § 552(a)(4)(B).

19      [44]In his concurring opinion in *Raines*, Justice Souter questioned the distinction the majority
20  drew between "personal" and "official" injury. See *Raines*, 521 U.S. at 830-32 (Souter, J.,
    concurring in the judgment) (noting that it was "fairly debatable" whether the injury the *Raines*
21  plaintiffs alleged was "sufficiently personal and concrete to give them standing"). As a result,
22  he argued, the case should be decided on the "more general separation-of-powers principles
    underlying . . . standing requirements." *Id.* at 832-33. Specifically, he noted that "a dispute
23  involving only officials, and the official interests of those, who serve in the branches of the
    National Government lies far from the model of the traditional common-law cause of action at the
24  conceptual core of the case-or-controversy requirement." *Id.* at 833. Because *Raines* involved
25  "in substance an interbranch controversy about calibrating the legislative and executive powers,
    as well as an intrabranch dispute between segments of the Congress itself," Justice Souter
26  concluded that judicial "[i]ntervention in such a controversy would risk damaging the public
27  confidence that is vital to the functioning of the Judicial Branch." *Id.* These observations are
    equally applicable in this case, which involves not only an interbranch dispute, but an intrabranch
28  dispute between segments of the House.

1    disciplinary action if he provided information concerning the cost of the Medicare Modernization

2    Act to Members of Congress. Specifically, plaintiffs argue that they have a right as legislators

3    to receive information from willing speakers under § 7211 and Section 618 of the Consolidated

4    Appropriations Act, and that they suffer personal injury when speakers are deterred from

5    disclosing relevant facts.

6          Plaintiffs' argument that they have standing to assert a violation of § 7211 and Section 618

7    fails for the same reasons that their § 2954 standing argument fails. Indeed, their claim that these

8    statutes give them standing is weaker than their claim regarding § 2954. In asserting rights under

9    § 7211 and Section 618, plaintiffs are in no different position than other Members of Congress

10   who did not receive information from the Chief Actuary. Their claim depends not on the fact that

11   they made a specific request for information, but on their generalized right to receive information

12   that government employees wish to convey to Members of Congress. As respects their § 7211

13   and Section 618 claims, therefore, they were "not . . . singled out for specially unfavorable

14   treatment as opposed to other Members of their respective bodies," and cannot "claim that they

15   have been deprived of something to which they *personally* are entitled," since the alleged injury

16   "runs (in a sense) with the Member's seat, a seat which the Member holds (it might quite arguably

17   be said) as trustee for his constituents, not as a prerogative of personal power." *Raines*, 521 U.S.

18   at 821. As in *Raines*, any violation of § 7211 and Section 618 causes no personal or

19   particularized injury to plaintiffs, but at most "a type of institutional injury . . ., which necessarily

20   damages all Members of Congress and both Houses of Congress equally." See *id.*

21         Further, any injury to plaintiffs caused by violation of § 7211 and section 618 is

22   insufficiently concrete to confer standing, since it is impossible for plaintiffs or the court to know

23   what information, if any, the Chief Actuary might have chosen to communicate to plaintiffs or

24   other Members of Congress in the absence of the threatened disciplinary action. Neither § 7211

25   nor Section 618 guaranteed plaintiffs the right to receive particular information, since the statutes

26   merely protect individual employees' right to communicate facts that they identify as important

27   and wish to disclose. The additional factors identified in *Raines* also weigh against a finding that

28   plaintiffs have standing to sue under § 7211 and Section 618, since plaintiffs have not been

23

1  authorized to represent Congress or the House of Representatives in this action, and denial of

2  legislator standing does not foreclose the possibility of an action brought by the Chief Actuary to

3  vindicate the violation plaintiffs allege.  See *id.* at 829.  Therefore, the court concludes that

4  plaintiffs lack Article III standing with respect to their § 7211 and Section 608 claims as well.[43]

5  **D.    Historical Practice Supports The View That Plaintiffs Lack Standing**

6      In concluding that legislators challenging the Line Item Veto Act lacked standing, the

7  *Raines* Court looked not only to precedent, but to historical practice to determine whether the

8  claims plaintiffs asserted in that case were the sort that had traditionally been adjudicated by

9  Article III courts.  See *Raines*, 521 U.S. at 826-29; see also *Walker*, 230 F.Supp.2d at 70-74

10 (conducting a similar analysis).  A review of the historical practice in this case supports the

11 court's conclusion that plaintiffs lack standing to sue.

12

13 _____

14 [43]Plaintiffs argue that they have standing under *Taylor v. Resolution Trust Corp.*, 56 F.3d
1497, as amended, 66 F.3d 1226 (D.C. Cir. 1995).  In *Taylor*, the D.C. Circuit held that a public
15 interest organization dedicated to supporting government employees lacked standing to sue under
the Resolution Trust Corporation Whistleblower Act, 12 U.S.C. § 1441a(q).  The organization
16 alleged that the RTC's unlawful retaliation against RTC employees had "interfere[d] with [its]
'ability to gather and disseminate information about the RTC.'"  *Id.* at 1507.  The court noted
17 that, under prudential standing principles, a party must show that "it falls within [a] statute's
'zone of interests' by demonstrating 'either a congressional intent to protect or regulate the interest
18 asserted, or some other indication that the litigant is a suitable party to pursue that interest in
court.'"  *Id.* at 1507 (quoting *Animal Legal Defense Fund v. Espy*, 23 F.3d 496, 502 (D.C. Cir.
19 1994)).  A plaintiff must satisfy both Article III and prudential standing requirements, however,
in order to bring suit.  See *Ocean Advocates v. United States Army Corps of Engineers*, 361 F.3d
20 1108, 1119 (9th Cir. 2004) ("OA must establish that it meets both the constitutional and
21 prudential standing requirements"); *Hydro Investors, Inc. v. Federal Energy Regulatory
Commission*, 351 F.3d 1192, 1195 (D.C. Cir. 2003) ("A party is aggrieved under this provision
22 only if it establishes it has both Article III and prudential standing to bring the petition").  Because
23 plaintiffs cannot show that they have Article III standing to sue, the fact that they may be within
24 the prudential "zone of interests" does not confer standing on them to file this suit.

25     Plaintiffs' suggestion that they have standing under the First Amendment is unavailing
because, unlike the plaintiff in *Taylor*, they do not assert a First Amendment claim in their
26 complaint.  For the reasons set forth in *Raines*, moreover, plaintiffs would not have Article III
27 standing to assert such a claim, as any First Amendment injury flows from their position as
legislators, and is not distinct from the injury suffered by other Members and by Congress as a
28 whole.  Stated differently, it is not sufficiently personal and particularized.

It is undisputed that between 1928, when § 2954 was enacted, and entry of the district court's order in *Waxman v. Evans* in 2001, the federal courts were not involved in efforts to enforce requests for information under § 2954.[46] Only two cases prior to *Waxman v. Evans* even mentioned the statute. In *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), the court referenced § 2954 in the context of a citizen suit under FOIA. The court noted that "the power of Congress to compel disclosure of agency records to the public is no greater than its power to compel disclosure to Congress itself," and cited § 2954 as one of several statutes Congress had enacted requiring executive officers to transmit information to Congress. See *id.* at 1072 n. 9.[47]    In

---

[46]Pls.' Mem. at 12-16 (noting that "[d]uring the . . . decades of the Great Depression and World War II, [§ 2954] seems to have been respected," and that, when the executive thereafter began to "claim unprecedented powers to withhold information," Members of Congress successfully invoked the statute without resort to litigation); Def.'s Reply at 8 n. 7 ("At least prior to *Waxman v. Evans*, requests for information under Section 2954 . . . were addressed 'outside the judicial arena'").

Similarly, the few cases that have addressed 5 U.S.C. § 7211 have involved suits brought by federal employees, not Members of Congress. See, e.g., *Nixon v. Fitzgerald*, 457 U.S. 731, 741, n. 20 (1982) (addressing a discharged Air Force employee's suit for damages against a former President of the United States in which the district court inferred a private right of action under § 7211); *Harlow v. Fitzgerald*, 457 U.S. 800, 806 n. 10 (1982) (suit by discharged Air Force employees against presidential aides in which the district court inferred a private right of action under § 7211).    The court has found no case that addresses Section 618 of the Transportation, Treasury, and Independent Agency Appropriations Bill for 2004, 118 Stat. 3, 344.

[47]In its amicus brief, the House Democratic Leadership asserts that the *Soucie* court upheld citizens' right to disclosure of a document "partly on the basis that Congressman Reuss's document request put to rest some of the agency's procedural arguments." (Amicus Curiae Brief of the House Democratic Leadership in Support of Plaintiffs' Motion for Summary Judgment ("Democrats' Brief") at 14 n. 24.)  The court's decision does not indicate that Representative Reuss' request was a companion to, or part and parcel of, a § 2954 request by seven Oversight Committee members, as the Democrats' Brief suggests. (See *id.*)  If anything, the decision suggests that Reuss requested the document under FOIA.  The court addressed the issue in concluding that the denial of Representative Reuss' document request "provided ample basis for [the non-Congressional] appellants to bypass as futile the step of filing a written request for the document, as ordinarily required by the OST."  This was so, the court stated, because, while Representative Reuss' "right as a citizen to obtain the Report under [FOIA was] equal to that of appellants, his right as a Congressman [was] presumably greater."  See *Soucie*, 448 F.2d at 1071 n. 6.  The authority cited by the court for this statement concerned the "Congressional savings

1    *Leach v. Resolution Trust Co.*, 860 F.Supp. 868 (D.D.C. 1994), the Ranking Member of the

2    House Banking Committee brought a FOIA action against the RTC and the Office of Thrift

3    Supervision ("OTS"), asserting that, under 5 U.S.C. § 552(d), individual Members of Congress

4    were entitled to receive confidential or privileged documents that could be withheld from other

5    members of the public. *Id.* at 870. The court declined to adjudicate the dispute under the

6    doctrine of equitable discretion enunciated by the District of Columbia Circuit, concluding that

7    "Representative Leach's complaint derive[d] solely from his failure to persuade his colleagues to

8    authorize his request for the documents in question, and that [he] thus ha[d] a clear 'collegial

9    remedy' capable of affording him 'substantial relief.'" *Id.* at 873-74.

10      Addressing Representative Leach's argument that it was "the alleged refusal of his

11    colleagues in the House to investigate this matter" that had led to the FOIA suit in the first

12    instance, the court noted that § 2954 provided a mechanism through which "small groups of

13    individual congressmembers can request information without awaiting formal Committee action."

14    *Id.* at 876 n. 7. Neither *Soucie* nor *Leach* demonstrates that it is traditional for the executive or

15    legislative branches to resort to the courts when they dispute the proper scope of disclosure under

16    § 2954. If anything, the cases suggest that this has *not* been the practice; in each of *Soucie* and

17    *Leach*, FOIA, rather than § 2954, was invoked.[48]

18      Looking beyond § 2954, there appear to be only four published cases in which the federal

19

_____

20    clause" of FOIA, 5 U.S.C. § 552(d), not § 2954. See *id.* (citing H.R. Rep. No.1497, 89th

21    Cong., 2d Sess. 11-12 (1966)). There is, as a consequence, no basis for inferring that a document

   request under § 2954 influenced the court's decision in any way.

22

23      [48]Indeed, following the court's decision in *Leach*, a group of Members on the House

   Oversight Committee apparently invoked § 2954, and obtained copies of the documents they

24    sought. (See Democrats' Brief at 15.) The Democrats argue that this shows judicial enforcement

   of plaintiffs' § 2954 request in this case would not have the radical consequences the House

25    leadership predicts, since the Whitewater documents at issue in *Leach* were more controversial

   than the Medicare documents at issue here. (*Id.* at 15-16.) This overlooks the thrust of the

26    leadership's argument. It contends that judicial enforcement of a § 2954 request would alter the

27    traditional balance of power between the legislative and executive branches, and among Members

   of Congress themselves, not that the production of documents in response to a § 2954 request or

28    interbranch negotiations related thereto would do so.

1    courts have been asked to resolve informational disputes between Congress or its Members and

2    the executive branch.[49]   None supports a finding that plaintiffs have standing here.   In *Senate*

3    *Select Committee on Presidential Campaign Activities*, 498 F.2d 725, the Senate committee

4    investigating the Watergate break-in attempted to enforce a congressional subpoena served on the

5    President in the face of his assertion of executive privilege.   The Senate resolution creating the

6    committee authorized it to "subpoena . . . any department, agency, officer, or employee of the

7    executive branch of the United States Government."   *Id.* at 727 n. 3.   When the President

8    declined to produce the requested materials, which included tapes of presidential conversations,

9    the committee sued in its own name and in the name of the United States. *Id.* at 727. While the

10   suit was pending, the Senate passed a resolution that authorized the committee to subpoena and

11   sue the President.   The resolution stated that "in subpoenaing and suing the President, [the

12   committee] was acting with valid legislative purposes and seeking information vital to the

13   fulfillment of its legitimate legislative functions."   *Id.*   Thereafter, Congress passed a bill that

14   conferred jurisdiction on the district court for the District of Columbia to hear any civil action

15   brought by the committee "'to enforce or secure a declaration concerning the validity of any

16   subpoena.'"   The President failed to exercise his veto power, and the bill became law. *Id.*

17

18   _____

19       [49]In addition to the four cases cited by the court, the amicus brief filed by the House
     leadership reports one occasion on which "the full House . . . voted to refer an executive branch
20   official (EPA Administrator Anne Gorsuch) to the U.S. Attorney for contempt. . . ." (Amicus
     Brief of the Bipartisan Legal Advisory Group of the United States House of Representatives in
21   Support of Defendant's Motion to Dismiss or in the Alternative for Summary Judgment ("House
     Brief") at 20.)   The brief states that the matter was "resolved shortly thereafter without a
22   prosecution." (*Id.*)   In fact, the executive branch and Gorsuch filed an action in the district court
     for the District of Columbia, seeking a judicial declaration that Gorsuch had acted lawfully in
23   refusing to release certain documents in response to a subpoena from a congressional
24   subcommittee. See *United States v. House of Representatives of the United States*, 556 F.Supp.
     150 (D.D.C. 1983).   As noted in the court's decision, although the House referred the matter to
25   the United States Attorney, "[t]he Executive Branch, through the Justice Department, . . .
     chose[ ] an alternate route, . . . bringing [a] civil action against the House of Representatives and
26   individual members of the Legislative Branch." *Id.* at 152. The district court dismissed the case,
27   declining to exercise its discretion under the Declaratory Judgment Act to hear the case. *Id.* at
28   153.

1    Although the court did not address standing, it is clear from the opinion that the

2    committee's suit was authorized by Senate resolution. Thus, traditional procedures governing

3    congressional subpoena enforcement actions were followed, with the consequence that the

4    committee acted on behalf of the full Senate. See 2 U.S.C. § 288b ("The Counsel shall bring a

5    civil action to enforce a subpena of the Senate or a committee or subcommittee of the Senate

6    under section 288d of this title only when directed to do so by the adoption of a resolution by the

7    Senate"); see also House Rule XI(2)(m)(3)(A)(i). *Senate Select Committee on Presidential*

8    *Campaign Activities*, therefore, suggests at most that there is an historical basis to conclude that

9    the Senate or the House, acting through an authorized committee, has standing to sue to enforce

10   a congressional subpoena. It does not support, either expressly or implicitly, the notion that a

11   committee, or one or more individual Senators or Members of Congress, independently have

12   standing to sue the executive branch to enforce a request for the production of documents or other

13   materials. See *Raines*, 521 U.S. at 829 ("attach[ing] some importance to the fact that appellees

14   had not been authorized to represent their respective Houses of Congress in this action"); see also

15   *id.* (Souter, J., concurring in the judgment) ("As appellants note, it is also possible that the

16   impairment of certain official powers may support standing for Congress, or one House thereof,

17   to seek the aid of the Federal Judiciary"); *Walker*, 230 F.Supp.2d at 68 ("it is of 'some

18   importance' that, like the plaintiffs in *Raines*, the Comptroller General here has not been expressly

19   authorized by Congress to represent its interests in this lawsuit").

20       The import of *AT&T*, 567 F.2d 121, is similar. There, the Justice Department challenged

21   a subpoena issued to AT&T by a House subcommittee investigating warrantless wiretapping by

22   the executive branch. AT&T took the position that it should comply with the subpoena, and DOJ

23   filed an action to enjoin it from doing so. Representative John E. Moss, chair of the House

24   subcommittee that had subpoenaed the information, was granted leave to intervene in the action.

25   *United States v. American Telephone & Telegraph*, 419 F.Supp. 454, 456 (D.D.C. 1976). On

26   appeal from the district court's order enjoining release of the documents to the subcommittee, the

27   circuit court addressed Representative Moss' standing to sue. It noted that he had been permitted

28   to intervene as a defendant "on his own behalf and on behalf of the Committee and the House,"

1    citing a House resolution that authorized his intervention and provided funds for Moss'

2    representation in the suit. *AT&T*, 551 F.2d at 391. The court declined to "consider the standing

3    of a single member of Congress to advocate his own interest in the congressional subpoena

4    power," since the House had authorized Moss to represent it in the suit, and "the House as a

5    whole ha[d] standing to assert its investigatory power, and [could] designate a member to act on

6    its behalf." *Id.* Like *Senate Select Committee on Presidential Campaign Activities*, therefore,

7    *AT&T* at most suggests that legislative branch suits to enforce requests for information from the

8    executive branch are justiciable if authorized by one or both Houses of Congress. The case does

9    not show that there is historical precedent for permitting suits by individual Members of Congress

10   without the consent of their House.[50]

11        The remaining two cases likewise afford no historical support for plaintiffs' position. As

12   noted earlier, in *United States v. House of Representatives of the United States*, 556 F.Supp. 150,

13   a House subcommittee issued a subpoena to Anne Gorsuch, Administrator of the Environmental

14   Protection Agency ("EPA"). When Gorsuch declined to produce the documents requested, the

15   subcommittee reported the matter to the full House, which passed a resolution citing Gorsuch for

16   contempt under 2 U.S.C. § 192, and certified the contempt resolution to the United States

17   Attorney for presentment to the grand jury under 2 U.S.C. § 194. *Id.* at 151. Rather than act

18   on the certified resolution, "[t]he Executive Branch . . . chose[ ] an alternate route," and brought

19

20   _____

21        [50]The case also reflects the "somewhat gingerly approach" courts adopt when confronted
     with "the delicate problem of accommodating the needs and powers of two coordinate branches

22   in a situation where each claim[s] absolute authority." *United States v. American Telephone &
     Telegraph*, 567 F.2d 121, 123 (D.C. Cir. 1977). Though the D.C. Circuit concluded that the

23   case was justiciable, it held that "[a] compromise worked out between the branches [was] most
     likely to meet their essential needs and the country's constitutional balance," and remanded the

24   action to the district court to permit further negotiation between the branches. *AT&T*, 551 F.2d
     at 394-95. "[N]egotiations did not resolve the dispute, [but] . . . did narrow the gap between the

25   parties." *AT&T*, 567 F.2d at 130. As a result, the circuit court observed, "[t]he parties'
     [positions were] sufficiently close . . . , and . . . their major concerns [outlined] with sufficient

26   clarity," that it could "intervene responsibly." *Id.* at 131. The court entered "a . . . judgment
     that reflect[ed] the compromises" between the branches, and encouraged them to engage in an

27
     ongoing "concerted search for accommodation. . . ." *Id.* at 130-32.
28

1   a "civil action against the House of Representatives and individual members of the Legislative

2   Branch" seeking a declaratory judgment that Gorsuch did not act unlawfully in withholding the

3   records. *Id.* at 152. As was the case in *Senate Select Committee on Presidential Campaign*

4   *Activities* and *AT&T*, the case involved a suit authorized by the full House, not a suit brought by

5   individual Members of Congress acting without such authorization.[51]

6       Finally, in *United States House of Representatives v. United States Department of*

7   *Commerce, supra*, 11 F.Supp.2d 76, the House of Representatives filed suit in its own name,

8   alleging, *inter alia*, that it would suffer "informational injury" if the executive branch provided

9   census data based on statistical sampling rather than actual population. The House asserted that

10  it was statutorily entitled to receive actual population figures, and that the information was

11  necessary to permit it to perform its "constitutionally mandated function" of apportioning the

12  House membership. *Id.* at 85. A three judge panel of the district court concluded that the House

13  had standing under *Raines*, because it had been "'deprived of something to which [it] personally

14  [was] entitled.'" *Id.* at 89 (quoting *Raines*, 521 U.S. at 821). Citing the "well established" rule

15  "that a legislative body suffers a redressable injury when that body cannot receive information

16  necessary to carry out its constitutional responsibilities," the court held that the failure to produce

17  actual population figures would "affect[ ] the House 'in a personal and individual way,'" and that

18  it constituted a sufficiently concrete, particularized injury to support standing. *Id.* at 86.

19      Addressing *Raines*, the court noted that its decision did not "give rise to generalized

20  legislative standing, by which the House or Senate could file suit whenever either alleged that the

21  Executive Branch was acting in a manner contrary to the law or the Constitution." *Id.* at 89.

22  Rather, it said, the case fell "within the narrow area left by the Court" because of the personal

23  nature of the injury the House had suffered. The court noted as well that the House had statutory

---

25     [51]The court, moreover, declined to decide the merits of the action. Noting that plaintiffs had "raised [an] executive privilege defense as the basis for affirmative relief," and finding that
26  judicial resolution of the privilege issue would not be necessary unless Gorsuch became "a defendant in either a criminal contempt proceeding or other legal action taken by Congress," the
27  court dismissed the action, citing its "duty to avoid unnecessarily deciding constitutional issues."
28  *Id.* at 152-53.

1   authority to prosecute the action, and that no other plaintiff would have standing to mount a pre-
2   census challenge.  *Id*. at 89.  Thus, like the three preceding cases, *United States House of*
3   *Representatives* suggests that, as a matter of historical practice, federal courts have adjudicated
4   informational disputes between the executive and legislative branches only when one of the
5   Houses of Congress has sought their intervention.  It provides no support for the proposition that
6   the courts should act when individual Members file suit.

7

8                                   **III.  CONCLUSION**

9        In sum, the court concludes that plaintiffs lack standing under *Raines v. Byrd* to seek
10  judicial enforcement of their request that the Secretary of the Department of Health and Human
11  Services produce the cost analyses prepared by the Chief Actuary of the Centers for Medicare and
12  Medicaid Services regarding the Medicare Prescription Drug and Modernization Act of 2003.
13  As a result, defendants' motion to dismiss is granted, while plaintiffs' motion for summary
14  judgment is denied.

15

16  DATED: July 24, 2006                    _____
                                             MARGARET M. MORROW
17                                           UNITED STATES DISTRICT JUDGE